The next case on the calendar is United States v. O'Brien. Good morning, your honors. May it please the court. Here this morning with respect to Mr. O'Brien's appeal from the district court in which he raises a number of issues related to his conviction in connection with possession of illegal substances. The first argument that I'd like to address is the simplest, I suppose, of the issues, and that is suppression. Suppression of his statements and suppression of the physical evidence that was seized. And our argument, as we set forth in our brief, turns on the fact that the consent here was not and could not have been voluntary, either to the oral consent or what followed later was a written consent. This court wrote in 2014 in the Taylor decision, and that was a case in which the defendant or the appellant there took a number of pills and was hoping to commit suicide before he was arrested. And this court held that under those circumstances, his ability to voluntarily consent was abrogated by the fact that he wasn't in his right mind, essentially. Could I ask you, what are we to make of the district court's finding that Mr. O'Brien perjured himself when he testified that he was never even taken to or interrogated at the police precinct? Because that doesn't seem to be the product of being overwhelmed by having his will overborne. That was an affirmative statement that was flatly contradicted by the officer's testimony. What is your position about that? I think Your Honor raises an important point, because I think that the issue here is what my client remembered, or what he had the capacity to remember. And our argument from the beginning of his, from the time of his arrest until ultimately when he's hospitalized, is that whatever happened there, he remembers some of it, but he doesn't remember a lot of it. And I think that when he testified that that didn't happen, and in fact the agent said that it did happen, I don't think that candidly, I don't think it was perjury. I think he had no recollection of it. He didn't say, I don't recall what happened. He said affirmatively he was never taken to the suffocate. I think that's his reality. I think his reality was very much distorted. And the things that he . . . to say, we know, as lawyers, we say, we don't remember or we're not sure. But in his mind, it didn't happen. It didn't happen because he doesn't remember it happening. Did the district court commit clear error then in its factual findings about what happened, its determinations at the hearing? Because that would seem to take this case outside of Taylor. In Taylor, the agents testified that the suspect was falling asleep during the interrogation, drowsy. And it's in that circumstance that this panel of this court addressed voluntariness. I think, Your Honor, that . . . I think it was plain error, clear error, I apologize. It was clear error by the district court. And I say that because from the very beginning of the intrusion by the officers and the agents into my client's apartment, it was clear that he had a drug problem. He had an addictive drug problem. He said that he had an addictive drug problem. He was . . . I mean, by all the standards, there were, I think, in excess of ten agents into the apartment. Their movements were quick. He said, I have a drug problem. But he was an experienced fellow. I mean, he had been a DA informant, correct? Yes, that's correct. But he also was experienced enough to know that the combination or the And that if he missed a dose, he knew what the consequences were. And the consequences were seizures, hallucinations, and ultimately, death. And it seems to me that if you are in a position, as any individual in a position, where you know that if you don't get the medicine you need or the treatment that you need within a certain period of time, that you're going to die, that I think everything else becomes peripheral. How do you pay attention to whatever else is going on around you if, in fact, you're sitting there thinking, I'm going to die? He asked for a dosage. Not surprisingly, the agents were not going to give him an illegal substance, and they didn't. But that caused additional stress on him. And then, ultimately, they gave him a Valium, which was in no way capable of controlling the symptoms that he feared. And as . . . Didn't he tell the agents, ask to take a Valium and said, this will help? He said, can I have a Valium? If you're not going to give me one pill, can I have the other pill? And, you know, he's not a medical person. And we know that whether it helped a little bit or a lot, by the time he was in the car, he was shaking. By the time he got to the courthouse and was handcuffed to the wall and made statements, he was beginning to experience tremors. And so we know . . . And then . . . And it's not surprising then, however his malady progressed, at the end of the day, when he is finished in court, he goes right to the hospital. And it's hard to put in . . . I mean, it's difficult to ignore the fact that when he's in the hospital, he's there for five days with, you know, nonstop intrusions. He's on 24-7 surveillance. He has . . . I'm monitoring, I should say. Surveillance. That's my criminal lawyer. He's being monitored. Every one of his bodily functions, his vital functions is being monitored 24-7. And he's receiving a number of different drugs to try to prevent him from dying. But there's testimony still that when he was . . . made the statements that he subsequently tried to suppress, he was lucid, that he was clear, and he was helpful and talkative, and that there was nothing like the circumstances that prevailed in Taylor to suggest that his will was overborne by his drugged state. I don't know what the specifics of the withdrawal would be like, you know, in the early stages, but it just seems to me that if you're sitting there answering questions, maybe hoping that if you can get this over with, they'll get you to a hospital and they'll get you medical treatment, that that overbears your will. It seems to me that if you're . . . if what's in your mind is, if this doesn't move along, I'm going to die, you try to move it along as quickly as you can. You know, I think today, I know the U.S. Marshals at least have a very different approach, because as soon as the Marshals think that there's a medical problem, defendants are taken directly to a hospital and they're not taken even for arraignment until they're cleared by the hospital. It seems to me that that was the appropriate approach here. This defendant, I think, would have said anything to be able to get to the medical treatment that he so desperately needed, and he's not making up the fact that he desperately needed it, because today, to stay in a hospital for five days and be monitored 24-7, you've got to be really sick. I apologize that I didn't get the rest of my points, but I do think this was worth the discussion. Thank you, judges. Good morning, Your Honors. May it please the Court, my name is Maggie Lee, and I represent the United States, and I was one of the prosecutors on the trial at this case. I'll just start right where Ms. Kelman left off. I think that as an initial matter, the important thing to remember is that a lot of what she actually said is just speculation and is not the actual record that was before the district court in the suppression hearing, and it is not what anybody testified to, not even Mr. O'Brien's not-credible testimony. There is no dispute that he said that he had a GHB addiction to the agents. There's no dispute that he, initially when they first came in, said that he was concerned about the withdrawal. But what the testimony was, was that there was a fear of future symptoms. There was a fear that in the future, there might be some consequence as a result. And the agents took that seriously, and they did ask him multiple times throughout the course of the day whether or not he was okay. He did not complain. At the very end of the interview at the police precinct, he asked for a doctor, and they stopped the interview immediately, and that was the conclusion of it. But significantly, throughout this entire period of time, when he was being Mirandized in the apartment, when he gave oral consent to search, when he was being transported to the precinct and giving a very detailed confession about how his drug trafficking network worked, when he was in the precinct going through the consent to search, he exhibited absolutely no symptoms of withdrawal. He was talkative. He was eager to cooperate. He was trying to stay out of jail. He was trying to work with the police the way that he had in the past to avoid being incarcerated. He had complete control over his facilities. Towards the end, he was using the location. What are we to make still of the fact that he spent five days in the hospital after the hospital records show he was suffering from tremors, confusion, visual distortion, and distress, and that was only a few hours after he made these incriminating statements. And what your adversary says, he had every reason to be in fear of death if he was not able to get the GHB or an analog promptly. Why wouldn't that overbear his will and prompt him to make statements in what's kind of fundamentally a coercive environment? I believe that, again, there's no dispute that he had an addiction to GHB and he was treated. I do think when you look at the medical records, they don't actually corroborate his account of the consequences of withdrawal. I mean, he claimed that he immediately fell to the ground at the conclusion of the Suffolk County proceedings and he had a seizure and had to be taken. There's nothing in the medical records that support that. It says that there was no history of a seizure. And he was brought to the hospital a little bit before 5 p.m. That's about six hours after he was initially arrested. And so I think that the real question is during those three hours, it was about 11 a.m. to 2 p.m., that he was with the federal agents, that all of the consent to search, the Miranda, the statements that are really at issue here were going on. The question is at that point, was he able to knowingly and voluntarily waive? Was he able to knowingly and voluntarily speak? And was he able to saying supports that he was able to do that? And he did testify. And he didn't say my will was overborn. He didn't say I was so afraid about what was going to happen that I gave them any answer that he wanted. He claimed that Agent Oliverian wasn't even there. He claimed that he was never even Mirandized. He claimed that he was never even taken to the police precinct, that he was taken directly to Suffolk County, and that he never got to the courtroom, where he then had a seizure at the conclusion. And then he claimed that the time that he signed the consent to search was when he was in the hospital. The agents came there, awoke him from a medically induced coma, and forced him to sign a consent to search that then apparently they backdated. So he did not testify. There's no evidence in the record that his will was overborn. And I think the nature of the conversations that he had with them, the way that they were having a very familiar, easy conversation, the way that they were so accommodating with him, even letting him smoke a cigarette at the precinct before he went in, this is not an instance where his will was overborn. He expressed some concern. They listened. They took it seriously. But he wasn't exhibiting any symptoms. He wasn't having any trouble. He knew exactly what he was doing. And if hours went by, we have the Suffolk County transcript. That was after everything had happened with the federal agents. And you look at the way he spoke to the court, the way he advocated for himself, he clearly and articulately explained exactly what the GHB was, what in the future his withdrawal symptoms could have. He was able to stand in court. The other point here is pretty clear from the record that he was concerned about getting to the hospital, right? I agree that I think he really, he did want to get mental, I mean, he did want to get medical attention. But I also think it's very clear from that that he was able to completely understand what was going on, articulate his position. He was not in a state of duress. He didn't, it wasn't even brought up at the very beginning. He was even able to thank the honor, the judge at the end. When we're looking at the totality of the circumstances at each juncture of this case and whether or not he was able to understand what was going on, even in the context of having this GHB addiction, I think it's clear that the district court's decision was proper. Am I right? I just want to make sure I'm understanding the record correctly. So the statements made and the consents given were within the first three hours of arrest? Yes. The testimony from the agents was that they arrested him at approximately 11 a.m. and that they turned, they stopped the interview and stopped talking to him at the police precinct around 2 p.m. And at that point he was turned over to Suffolk County where he was processed and then taken to the Riverhead Courthouse. So it's about a three hour window of time. And even he said when he testified that at night he would go three hours without taking any GHB. That he would wake up at about three hours and that's when he would take it again. And so it's yet another instance of the way that he's now, they're now speculating about what he was going through and what he was experiencing. That's not in the record. The district court had the testimony of the agents in front of her. She had the record, the documents. She was able to observe the defendant when he testified and the preposterous claims that he made about law enforcement and about the way the circumstances had gone down. And making those credibility assessments, looking at the totality of the circumstances, she found that all, that the waiver was knowing, that the Miranda rights waiver was knowing and voluntary and that the consent to search, both the initial oral one, which was also confirmed on his jail call, and then also his written consent was voluntary. And I also think one of the things she took in consideration, which is also I think appropriate to look at now that we're seeing what his argument is here on appeal, is at every stage he raised a new argument as to why it should be suppressed. I mean, before he even testified, he claimed that when they first came in, he had no idea what was going on and he was going through withdrawal. After he heard some of the jail calls and saw some of the other evidence, when he testified, he claimed that he knew exactly what was going on in his apartment, that he knew exactly what was going on in the car when he was being transported, but that he was never advised of his Moran rights and he basically didn't make any of the statements that they said, and that the consent to search, which although if you look at it, has the exact same signature that he signed on other things, was not his signature, although he thinks he was awoken from a medically induced coma. And all of these changing stories, I think, went to the overarching determination as to the credibility of the defendant. And then when you take out the defendant's testimony, which really simply was not credible, and you look at what the agents testified to, the evidence that was before the district court, it really was clear by the totality of the circumstances that the Miranda waiver was knowing and voluntary, that he was still voluntarily making statements as he continued to make those statements in the car and in the police precinct, and that both the consents were also voluntary. Thank you. Your Honors, perhaps the government inadvertently makes the best argument that the defendant could make, and that is with respect to references to crazy claims by the defendant and preposterous claims by the defendant. The fact that he didn't remember being in the police station and he didn't remember this and that never happened and a variety of those different incredible concepts, because we know what happened and we have no reason to believe that he wasn't in the precinct or how the progression went, I would ask the Court to consider the fact that it's because he's either beginning to have withdrawal symptoms or is so in fear of having the withdrawal symptoms that he really doesn't know what was going on. And that seems to me to be clear by the fact that his position changes as frequently as it changes. The bottom line is the one thing that's consistent is the fact that he really fears for his life, and he makes that point repeatedly. Now, if he thinks that he was awakened from a coma and signed it when, you know, in the middle of this coma, perhaps that's what he thinks. The reality here, my argument is, that the reality here is very separate from the objective reality in here, is very different from his individual reality because he is at least at some point beginning to have serious drug withdrawal complications, but even in the outset is in fear of having them. The first thing he says to them is, please let me have some of the GHB, because otherwise I'm going to go into withdrawal and I could die. And if I'm sitting there thinking while they're asking me questions, you know, that the only way I can get medical attention is to give them what they want. They can have whatever they want, because I don't want to die. I have another question for the court, and that is respectfully, will the court allow me, I know this is my rebuttal time, to just briefly address the issue of scheduling, which I hadn't gotten to do in my initial, thank you. I did want to just speak very briefly about the scheduling issue that we've briefed in, I think thoroughly in the brief, but it's our position, members of the court, that the delegation of the scheduling issue, of the scheduling of this particular drug as a Schedule I narcotic is an unconstitutional delegation of power by the Congress to one of its agencies. It's interesting and I think critical in a sense to note that methadone was not scheduled ultimately as a Schedule I narcotic until April 2014. That was when it was permanently scheduled. That was well after the conclusion of all of the events in this case. Now, there were temporary delegations or temporary approvals along the way, but those are published in the Federal Register and provide little or no notice to the public at large. And it wasn't until after the conclusion of my client's case that it was actually listed as a Schedule I narcotic. And in fact, it's interesting to note that even today, even today, this drug does not appear in the sentencing guidelines. Another argument that I make, and I seem out of time, but another argument that we would ask the court to look at is the ratio, the adoption of the 500 to 1 ratio. It just seems to us that it's completely random. There were no hearings. There was no medical evidence as to how they arrived at that or why they arrived at it. It seems completely arbitrary. Thank you very much. Thank you both. We'll take the matter under advisement.